In re Charles L. McCUNE, Deceased.

## Appeal of DISTRIBUTION COMMITTEE of the McCUNE FOUNDATION.

Superior Court of Pennsylvania.

Argued Oct. 9, 1997.

Filed Dec. 4, 1997.

G. Donald Gerlach, Pittsburgh, for appellant.

Mark A. Pacella, Attorney General's Office, Pittsburgh, for Com., participating party.

Samuel W. Braver, Pittsburgh, for Integra, participating party.

Before TAMILIA, POPOVICH and HESTER, JJ.

TAMILIA, Judge:

The Distribution Committee of the McCune Foundation appeals from the lower court's Order dated October 9, 1996, whereby the court denied the Committee's motion to remove a non-suit. On appeal, the Committee presents the following reasons the trial court erred in denying its motion to remove the non-suit. First, the Distribution Committee contends that it has standing both to open the trustee's first and partial account and to maintain this appeal. According to the Committee, the lower court improperly denied it standing to review the first account; and as a result, the court failed to consider evidence of transactions in the first account as substantive evidence of the trustee's breaches of fiduciary duty. Second, the Committee argues it presented sufficient evidence of conduct after the first account to withstand a motion for non-suit. It claims the lower court applied the wrong standard of review and maintains that the trustee's acquisitions and retention of its corporate parents' securities constituted sufficient evidence of self-dealing and/or imprudent jeopardizing investments, prohibited by the trust document, Pennsylvania law and/or the Internal Revenue Code. In their most basic form, the Committee's arguments are (1) the Committee has standing to bring this action and (2) the Foundation's corporate trustee breached its duties of loyalty and care by self-dealing and failing to diversify the Foundation's stock holdings.

The McCune Foundation was established under the will, as amended by codicil, dated April 22, 1974, of Charles L. McCune. Article 6, Section 1, of the will empowered the Distribution Committee to direct distributions of the Foundation funds. Under Article 7, the Union National Bank of Pittsburgh (UNBP) was appointed corporate trustee with authority to manage the Foundation's investments. In the codicil, UNBP was directed to vote the Foundation's UNBP stock according to the written directions of the Committee. Subsequently, the Foundation

was funded with over one million shares of Union National Corporation (UNC) stock. Although UNBP was named as corporate trustee, it merged into UNC on February 8, 1982. Thereafter, on January 26, 1989, UNC merged with Pennbancorp to form Integra Financial Corporation (IFC).

On September 17, 1991, the Committee initiated litigation by filing a Petition for Citation for Rule to Show Cause, seeking the appointment of two of its members as co-trustees of the Foundation. On May 4, 1992, the Committee filed a second petition seeking to remove the corporate trustee. Subsequently, the Court of Common Pleas denied cross-motions for summary judgment, and on April 13, 1994, the Committee filed a third "consolidated, amended and restated" petition seeking 1) to open the trustee's first and partial account, 2) to surcharge and remove the trustee, 3) to join Robert Patton as a party-defendant, 4) to impound the fees of the trustee and its counsel and 5) to obtain reimbursement of the Committee's attorney fees. By Memorandum Opinion dated December 15, 1994, the Court of Common Pleas held that the Committee lacked standing to seek review of the first account under 20 Pa.C.S. § 3521, **Rehearing; relief granted.**

On April 17, 1996, the trial court commenced an evidentiary hearing on the Committee's third petition. It granted the trustee's motion in limine restricting testimony to transactions after the trustee's first and partial account. On May 1, 1996, the court granted the Attorney General's motion for a compulsory nonsuit. On October 9, 1996, the Committee's motion to remove nonsuit was denied by the Court en banc. On November 6, 1996, the Committee filed notice of appeal.

The first issue presented is the Committee's standing, both to contest the trustee's first account and to bring this appeal. With regard to the Committee's challenge of the trustee's first and partial account, the Probate, Estates and Fiduciaries Code, § 3521 *supra*, provides: "*If any party in interest* shall, within five years after the final confirmation of any account of a personal representative, file a petition to review any part of the account . . . the court shall give such relief as equity and justice shall require."

(emphasis added.) This provision is made applicable to trusts by virtue of 20 Pa.C.S. § 7183, **Notice, audits, reviews, and distribution.** While Section 3521 states that "any party in interest" may challenge a personal representative's account, appellant acknowledges that, "No case sets forth a specific requirement for standing under 20 Pa.C.S. § 3521 other than that otherwise necessary to be a party in a proceeding." (Appellant's brief, p. 24.) Moreover, courts interpreting standing under Section 3521 have incorporated the same concepts, which underlie standing as a general notion. *See In re Trust Under Agreement of Keiser,* 392 Pa.Super. 146, 149–51, 572 A.2d 734, 736 (1990).

With regard to the right of appeal, Rule 501 of the Pennsylvania Rules of Appellate Procedure states, "[e]xcept where the right of appeal is enlarged by statute, *any party who is aggrieved* by an appealable order may appeal therefrom." Pa.R.A.P. 501, **Any Aggrieved Party May Appeal.** (emphasis added.) An aggrieved party must have a substantial interest at stake. *In re Francis Edward McGillick Found.,* 537 Pa. 194, 197–99, 642 A.2d 467, 469 (1994). "A 'substantial' interest is an interest in the outcome of the litigation which surpasses the common interest of all citizens in procuring obedience to the law." *In re Barnes Found.,* 443 Pa.Super. 369, 378, 661 A.2d 889, 894 (1995) (citations omitted). In addition, the party's interest must be adversely affected in a manner, which is both direct and immediate. *Keiser, supra.*

A 'direct' interest requires a showing that the matter complained of caused harm to the party's interest. An 'immediate' interest involves the nature of the causal connection between the action complained of and the injury to the party challenging it, and is shown where the interest the party seeks to protect is within the zone of interests sought to be protected by the statute or constitutional guarantee in question.

*Barnes, supra* at 378, 661 A.2d at 894 (citations omitted).

In this case, it is undisputed that the Committee does not possess a beneficial interest in the Foundation. The Committee,

therefore, has no stake in the funds distributed by the Foundation and cannot be directly aggrieved by the trustee's actions. *Keiser, supra.* Although standing does not require the presence of a direct economic interest, it does mandate that a party possess some sort of substantial interest, which has been adversely affected by the alleged misconduct. *McGillick, supra.* In the absence of a beneficial interest, the Committee must demonstrate the existence of some other interest, which would justify its standing to pursue this matter.

▪▪▪ The Committee argues that it possesses a fiduciary interest on behalf of the Foundation's beneficiaries. "The beneficiary of charitable trusts is the general public to whom the social and economic advantages of the trusts accrue." *Pruner Estate,* 390 Pa. 529, 531, 136 A.2d 107, 109 (1957). Under these circumstances, however, the general public is properly represented by the attorney general, not the Committee. *See Valley Forge Historical Soc'y v. Washington Mem'l Chapel,* 493 Pa. 491, 426 A.2d 1123 (1981); *Wiegand v. Barnes Found.,* 374 Pa. 149, 97 A.2d 81 (1953). Although the attorney general does not have exclusive standing with regard to the enforcement of charitable trusts, a private party seeking to enforce a charitable trust must possess an interest in the litigation, which surpasses the common interest of the public in continuing to benefit from the trust. *Wiegand; Barnes, supra.* Acting as purely the representative of the public, the Committee cannot acquire an interest, which surpasses that of the general public. In order to have standing to bring this action, the Committee must possess its own substantial or special interest in the enforcement of the trust. *Wiegand, supra* at 153–55, 97 A.2d at 83.

As previously stated, the Committee's interest in the trust need not consist of a direct, pecuniary benefit, but the interest must be of at least incidental benefit to the Committee. The Committee cites *McGillick* in support of the existence of its alleged special interest; however, *McGillick* is distinguishable from the instant matter. In *McGillick,* the Court characterized the Roman Catholic Diocese of Pittsburgh as "an incidental beneficiary" of the trust and found that it had standing. *Id.* at 196, 642 A.2d at 468. Unlike the Catholic Diocese, the Committee is not an incidental beneficiary of the Foundation. It does not distribute Foundation funds in order to promote its own substantive, religious or social goals. While the Committee has discretion in distributing Foundation funds, it does not derive a benefit or fulfill a programmatic function through such distributions. Unlike the diocese, it possesses neither the "integral involvement of the diocese in the awarding of scholarships," nor the prerogative exercised by the diocese, in the establishment of a vocational school. *Id.* at 199, 642 A.2d at 469. For these reasons, the Committee does not have the relationship which would warrant the finding of a special interest in the trust. Without such an interest, the Committee cannot be adversely affected by the conduct of the trustee and has no standing to continue this action.

▪▪▪ The Committee has not only failed to demonstrate the existence of its interest in enforcing the trust, it has also failed to show that *anyone* was adversely affected by the decisions of the trustee. "A trustee cannot be surcharged for a breach of his duty unless the breach caused a loss." *In re Inter Vivos Trust of Mendenhall,* 484 Pa. 77, 82 n. 3, 398 A.2d 951, 954 n. 3 (1979). Moreover, a party cannot be legitimately aggrieved, unless that party has suffered a loss.

▪ Realistically, the trustee could be surcharged for the amount of loss suffered by any legitimately aggrieved party. In this case, however, there was no depreciation in the value of the trust's principal, which would justify surcharging the corporate trustee.[1] The value of the Foundation's assets increased from $85,867,997 to approximately $400,000,000, while the Foundation made charitable grants in excess of $156,000,000.

---

1. *See In re Inter Vivos Trust of Mendenhall,* 484 Pa. 77, 82, 398 A.2d 951, 954 (1979) ("[A] surcharge is justified for any depreciation in the value of principal resulting from the breach of duty."); *Estate of Pew,* 440 Pa.Super. 195, 237, 655 A.2d 521, 542 (1994) ("The primary duty of a trustee is the preservation of the assets of the trust and the safety of the trust principal.")

*Compare McGillick, supra* at 201–03, 642 A.2d at 471 (noting Foundation's assets increased in value from $873,000 to $3,500,000, while the Foundation made grants of $753,000). Consequently, the trustee cannot be surcharged, and no party can be legitimately aggrieved by the trustee's actions.

 The Committee's entire claim of loss is based on allegations of an unrealized higher rate of return. Estimations of such an unrealized return are inherently uncertain. Furthermore, in calculating this unrealized return, the Committee's experts improperly ignored the will's restrictions on reinvestment,[2] as well as Pennsylvania law on the principle of diversification. Finally, the Committee cannot base its allegations of an unrealized return solely on the "retention of stocks which the trustee received from the settlor" because mere retention of this stock does not constitute negligence on the part of the trustee. *Pew, supra* at 240, 655 A.2d at 544 (citations omitted). For the aforementioned reasons, the Committee has failed to establish the aggrievement, which is a necessary prerequisite of both its standing and its ability to surcharge the trustee.

The Committee also contends the Foundation's corporate trustee breached its duties of loyalty and care by self-dealing and failing to diversify the Foundation's stock holdings. The Committee maintains that it presented sufficient evidence of wrongdoing and argues that the lower court applied the wrong standard of review.

 The standard of review as to "the propriety of an entry of compulsory nonsuit" requires that an appellate court must "give the plaintiff the benefit of every fact and reasonable inference arising from the evidence." *Harvilla v. Delcamp,* 521 Pa. 21, 25, 555 A.2d 763, 764 (1989). However, the court may consider testimony elicited upon cross-examination, as long as that cross-examination does not exceed the scope of direct examination. *Bowser v. Lee Hospital,* 399 Pa.Super. 332, 582 A.2d 369 (1990). Moreover, "reversal is not mandated if the admis-

sion of some defense evidence is harmless error." *Joyce v. Boulevard Physical Therapy & Rehab.,* 694 A.2d 648, 653 (Pa.Super.Ct.1997).

As to the standard of review, the Committee cites the "most egregious example" of the trial court's errors as being its finding that " '[t]he 1986 Foundation purchase of 100,000 shares of UNC stock were purchased from PNC Financial.' " (Appellant's Brief, pp. 14–15, *citing* Slip Op., Kelly, J., 1/22/97, p. 20.) The Committee argues it is entitled to the benefit of every reasonable inference and then contends that the Foundation actually purchased the 100,000 shares of UNC stock from UNC, not PNC Financial. In other words, UNC first purchased the stock from PNC Financial and thereafter, immediately resold these shares to the Foundation. If this is, in fact, the most egregious example of the trial court's errors in applying the appropriate standard of review, then this Court must affirm.

 Article 7(a) of the will authorizes the trustee to "accept, retain and invest in" stock of UNBP, permitting the trustee to purchase its own stock. Furthermore, under Article 7, the trustee includes UNBP and any other corporation it "shall be consolidated with or merged into, or its assets sold as an entirety to." Since UNC is included within this definition of trustee, the Foundation is authorized to purchase UNC stock from UNC or anyone else. Consequently, the Committee's contention that the trial court failed to apply the appropriate standard of review is without merit. Even after giving the Committee the benefit of every fact and reasonable inference arising therefrom, the appellees are still entitled to the grant of nonsuit in their favor.

 As is evident from the above discussion, the corporate trustee's alleged self-dealing is almost solely a function of what is or is not authorized by the trust document. Paradoxically, the will contains several provisions, which are apparently in conflict with one another. As stated previously, Article 7 of the will authorizes the trustee to purchase its

---

**2.** Article 7 of settlor's will restricts the reinvestment of the sale proceeds from his Texaco and Union National Bank stock to domestic stocks or securities issued or guaranteed by the United States government.

own stock. Article 6, Section 6, however, appears to prohibit these purchases by incorporating § 4941(d), **Self-dealing,** and § 4944, **Taxes on investments which jeopardize charitable purpose,** of the Internal Revenue Code (Code).

Article 7(a) of the will empowers the corporate trustee, in its sole discretion, "[t]o accept, retain and invest in any real or personal property, including stock of The Union National Bank of Pittsburgh, without restriction to legal investments." The term trustee includes UNBP and any other corporation it "shall be consolidated with or merged into, or its assets sold as an entirety to." As a result, Article 7 authorizes UNBP, UNC and IFC to purchase their own stock, when acting as corporate trustee for the McCune Foundation.

▪ Nevertheless, Article 6, Section 6, of the will appears to prohibit these very same transactions by incorporating the definition of self-dealing contained in Section 4941(d) of the Code. "Notwithstanding any other provision contained in this will, the Distribution Committee and the trustees shall themselves be prohibited, from engaging in any act of self-dealing (as defined in Section 4941(d) of the Internal Revenue Code [of 1954] )." Article 6, Section 6. Section 4941(d) of the Code defines self-dealing to include "(A) sale or exchange, or leasing, of property between a private foundation and a disqualified person" and "(B) lending of money or other extension of credit between a private foundation and a disqualified person." Under the Code, the trustee's corporate parents, "UNC" and "IFC" are each "disqualified persons." *Id.,* §§ 4946(a)(1)(B), (b)(1). In addition, the trustee's actions, in purchasing its own stock, clearly constitute self-dealing as defined by Section 4941(d). *Construing Article 7 and Article 6, Section 6, in this manner, however, renders Article 7 entirely moot and is obviously at odds with the intent of the settlor.* As the trial court correctly found, " 'In Pennsylvania, the law honors a settlor's right to determine the disposition of his estate.' *Trust Agreement of Cyrus D. Jones Dated June 24, 1926,* 414 Pa.Super. 361, 366–68, 607 A.2d 265, 268 (1992) ('When interpreting a trust instrument, the intent of the settlor is

paramount and if that intent is not unlawful, it must prevail.')." (Slip Op. at 30.)

▪ Although the settlor incorporated the definition of "self-dealing" contained in Code § 4941(d), he did not incorporate §§ 4946(a)(1)(B), (b)(1), which define "disqualified person." Therefore, while the trust document prohibits self-dealing as defined in Section 4941(d), it *qualifies* UNBP and its corporate successors, by empowering them to "accept, retain and invest in" their own stocks. In essence, the settlor accepts the Code's definition of self-dealing, but allows or qualifies the trustee to engage in self-dealing by purchasing its own stock. Where provisions in an instrument appear to conflict, they should be read in such a fashion as to give effect to both and/or fulfill the intent of the settlor. As a result, Article 7 and Article 6, Section 6, must be read together so as not to create a conflict.

▪ Article 6, Section 6, of the will creates a second potential conflict with Article 7 by incorporating Code § 4944. "Notwithstanding any other provision contained in this will, the Distribution Committee and the trustees ... shall themselves be prohibited ... from making any investments in such manner as to subject the foundation to tax under Section 4944 of the Internal Revenue Code [of 1954]." Article 6, Section 6. As the lower court explained, "Section 4944 imposes a series of excise taxes upon a private foundation and its management if the foundation 'invests any amount in such a manner as to jeopardize the carrying out of any of its exempt purposes.' " (Slip Op. at 29, *quoting* Code § 4944(a)(1) in part). Jeopardy occurs if "it is determined that the foundation managers, in making such investment, have failed to exercise ordinary business care and prudence." Treas. Reg. § 4944–1(a)(2)(i). Ordinary care sometimes includes diversification of the Foundation's portfolio. *Id.* As a result, the Committee claims the trustee had a duty to diversify the Foundation's stock holdings.

Article 7 of the will, however, clearly gives the trustee "sole discretion" to "accept, retain and invest in" its own stock. Since its inception, the Foundation has owned large

blocks of the corporate trustee's stock. Moreover, there is evidence that the trustee exercised its power in order to simply maintain the Foundation's share in UNBP and its corporate successors. Continued ownership of this stock necessarily hinders the trustee's ability to diversify, which the Committee claims it has a duty to do.

■ This second apparent conflict between Article 7 and Article 6, Section 6, may be resolved in the following manner. First, there is no duty to diversify under Pennsylvania law. *Estate of Knipp,* 489 Pa. 509, 513–14, 414 A.2d 1007, 1009 (1980). Second, any alleged duty to diversify must take into account "the foundation's portfolio as a whole," including the fact that the trust was originally funded with a large block of the trustee's stock. *See* Treas. Reg. § 53.4944–1(a)(2)(i). Third, the treasury regulations provide examples of "jeopardy" investments, such as "[t]rading in securities on margin, trading in commodity futures, investments in working interests in oil and gas wells," which do not resemble the Foundation's investments. *Id.* Finally, Article 6, Section 6, embodies the settlor's intent that the trustee be prohibited from acting so as to *actually* subject the Foundation to tax under Section 4944 of the Code. Despite being audited by the Internal Revenue Service, the Foundation has never, in fact, been subjected to tax under Code § 4944. Consequently, the trustee's actions in purchasing its own stock cannot be viewed as violating Article 6, Section 6, even if they might theoretically be viewed as violating Code § 4944.

■ Finally, as detailed by the lower court, the appellants as members of the Committee were empowered by the codicil to the will to give written instructions to the corporate trustee as to voting the stock. Throughout their tenure, they raised no objections to alleged breaches of fiduciary duty or selfdealing. (Slip Op. at 13, 15–16.) Under well-established and recognized rules of equitable estoppel, they are now precluded from objecting. *See Zitelli v. Dermatology Education and Research Foundation,* 534 Pa. 360, 633 A.2d 134 (1993). No illegality has been established on the record; the set-

tlor's intent has been fulfilled. *See Cyrus Trust, supra.* The appeal therefore fails.

Finding no error in the well-reasoned decision of the trial court, we affirm.

Order affirmed.